We have the pleasure this morning of commencing with an admission to our bar. We will proceed to the podium, and I will invite Judge Wallace to make the motion. May it please the Court, I'm going to move the admission of Amber Jordan, who's been my clerk, I think, longer than, other than a permanent clerk, longer than about anybody can reasonably expect. She's going to have been with me three and a half years by the time she leaves. She's a member of the bar in good standing of the highest court in New York. Over those three and a half years, I certainly have knowledge of her credentials, and I'm more than satisfied that she possesses the necessary qualifications. She's going to make a fine lawyer. Okay, thank you. Now let me inquire if there is a need to go deliberate. Okay, I guess I'll vote on it. I'll vote to affirm the motion or grant the motion. And I, too, agree to grant the motion. Consider the motion granted. Welcome to the bar. If you will proceed, the clerk will administer the oath. Thank you. Welcome to the bar, Ms. Jordan. The first argued case this morning is number 2012, 5097, James Linick against the United States. Mr. Scott. May it please the court. This is a case in which there is, in my view, a manifest legal error that has been disguised as a factual determination. In order to affirm the lower court, one needs to believe that in the case of three allowed patent applications addressed to a munitions system that would have been granted to an inventor who made his livelihood by disclosing and marketing inventions and using as his marketing tool the disclosure authorization of the ITAR, International Traffic and Arms Regulations, that allows the wide disclosure of inventions that have been granted a foreign filing license or have been published under the PCT regulations have absolutely no value. My impression, and perhaps yours, is that what really got the attention of the Court of Federal Claims and led to their decision was the difficulty of evaluation, how to measure the damages. I know they used the word they can't be speculative, but I think that was a bit too loose. And essentially, do you agree that what they held is that when you can't figure out what the damages are, no damages will be avoided? Well, I think that's what they held, but it's actually more than that, Your Honor. What this no-speculation standard does is, in fact, turn the evaluation of the property in question on its head, because it takes a negative view of the way in which you evaluate the property. So how do you think this property should be evaluated? In the way that the lower court and this court evaluate any kind of property that has been so egregiously interfered with by the government that it no longer has value to its owner. Okay, so what is that? You propose about four different standards in your brief, so I'm having a hard time pinning down what it is you really think we should do. What I think, in sum, and we're unclear, we apologize. In sum, it's what the value of the property was based on a comparison to other sales using the normal reasonable inferences as to value which are appropriate in a compensation case. Okay, so market value analysis, is that what you're saying? That is, in fact, I think the best approach. Okay, and the only thing that you proffered, though, for market value was the earlier technology. Well, I think that is a strong indication of what the value was, because it was for a previous embodiment of this invention. I mean, just to back up and understand what's involved here, Mr. Linick developed, in the early 90s, a way to correct munitions that are shot from cannons, that are what's so-called trajectory weapons. And he developed an initial method of how to do that, and he had two patents that were addressed to that subject matter, and one in Switzerland, and he sold those to the Bofors company for $3.5 million. He then began to develop a follow-on system that is actually intended to deal with a specific problem of doing this kind of technology in a very low-cost environment. It was one of the reasons he was very interested in the foreign market, because foreign countries don't necessarily have the same kind of budgetary funds available to develop these weapons. So, the idea was something that could be retrofitted on existing systems, and he attempted to market it. And as the evidence showed, because his entire system, the system that was integrated and would have been the best disclosure that he could have made to domestic and foreign companies, he was blocked from presenting it. Professor Scott, let me get to that. I'm having trouble asking this question, and you're going to have trouble answering it. But either what couldn't he say, now you know why you're going to have trouble answering it, or what could he say when he was speaking to the foreign companies? Well, I think your question places a finger right on what the very problem is. He had two earlier patents that had been granted foreign filing licenses and were subject to PCT publication, which he could disclose to anyone. But when he developed his integrated system that took those earlier technologies… Could he say to, say, a foreign government, I've got an improvement that will let you retrofit and it will be cheaper and you could use it? Could he say that much? No, I don't believe he could on the basis of the technology that was disclosed in the applications under secrecy order. Didn't he admit at the trial court that he could? No, I don't think that's… What he said was that he could disclose his prior inventions, not… In fact, that was his point. He couldn't disclose the… What was he saying on those sales trips? Well, he was showing them the prior technology and trying to interest them in that as a basis for depending on identifying a particular customer so that he could perhaps seek modification of the order otherwise to disclose the entire integrated system. And the trial court made a factual finding that between 1997 and 2002 that nobody was interested in even the concept of the prior technology and that though he got a lot of money up front for those other patents, that relationship totally soured and no one ever did anything with those and he never got the ongoing royalties. Well, the court did make that finding. Let me comment about the first… Which we reviewed for clear error, correct? Oh, I understand that. I think the clear error in terms of the fact that he had the time between 1997 and 2002 to market the invention doesn't take into the account the fact that what he had in 1997, quite frankly, was the initial disclosure that one makes to a patent attorney of a concept. I mean, in other words, he had a basic idea. I mean, he disclosed it to me. I was his patent attorney. And he then, on the basis of that, he had two other patents that he already filed for that he was trying to interest people in. And when he got enough interest that he thought maybe the integrated system would be marketable, he filed a provisional application. Now, the trial court found that that company in Germany didn't have a sufficient interest. But when he was attempting to market it thereafter, the secrecy order that was imposed upon him only allowed him to disclose the components and not the entire system. And that's what prevented him. So I think the court found… What evidence did you put on of marketing efforts after 2002? It's in the record. He went to Thailand, to India, to Japan. Yeah, but in Thailand they want him to teach, not… That's true. But remember, you have to look at that effort in the light of the fact he couldn't tell them anything. Yeah, he couldn't tell them anything in Japan. He couldn't tell them anything because he couldn't speak Japanese and he didn't have an interpreter. Well, but he also, he did make, and it's in the record, he did make initial disclosures of the things that were publicly available in an attempt to interest them. But what he couldn't do was disclose the integrated system that would have allowed you to retrofit existing rounds. I mean, Japan's an excellent, excellent example. He got a meeting with a high-ranking member of the self-defense force. He was able to disclose just the initial components, but what he couldn't do, and this is the fundamental problem that this statute gives to an individual inventor. Here we have a man who has an integrated system that there's no question that it would be capable of being retrofitted on existing rounds or existing missiles. The Marine Corps seems to think that it's dangerous to their Marines when it fails to deploy. Well, that's certainly evidence in the case, but remember, what happened there was he was only able to disclose his guidance invention and his vertical reference invention, which unfortunately is a fairly sophisticated invention. It's not clear that the Marine Corps understood it. But the important point is that what, and this is what the real problem with evaluation under this statute is and why a standard, the standard imposed of not speculation by the lower court is just manifestly wrong. But the statute, regardless of whether the court, and whether that was really the standard imposed, I think is debatable, because the court did refer to the fact that in the legislative history, Congress didn't want speculative damages, but they used the phrase damages. And once Congress uses the phrase or word in a statute, if it doesn't independently define it, we assume it has a common law meaning. And the common law meaning of damages does imply some concrete harm. And what the trial court said, it was assessing whether or not you put in any evidence of concrete harm. And yes, it might be a difficult posture to be in, but that statute doesn't give you a right to statutory damages. It doesn't give you a right to some kind of a license fee. It says actual damage. That's absolutely correct. And what I'm suggesting is that using as your tool to assess the so-called not speculative standard is that instead of, the first thing it does is it makes you attack each piece of evidence piecemeal, right? What's the comparative value of this piece of evidence? Instead of looking at the body of evidence as a whole, and what I'm suggesting is that when one looks at the evidence, and that's what's wrong here, if one articulated an appropriate standard for the evaluation of damages and say, okay, so what you're going to say is that it's got to be a demonstration, no question, of concrete harm, and of some evidence by the preponderance of the evidence of what the magnitude of that harm is. But what sort of evidence, let's accept he was under a secrecy order, he was under a prohibition of export control, and he complied diligently in avoiding violations of those orders so that he could not provide the details to the potential customer. That's correct. And I have yet to hear or understand your telling me, and I think the trial court had exactly this problem, how do we measure the worth of something where the customer, nobody would buy it, of course, naturally, they didn't know what they were buying, so to say that they were saying, well, we'll give you several million dollars, they couldn't do that when he wasn't able to tell them, apparently, even the advantages, perhaps he said, I've got some improvements. So how does one measure? Well, I think that question focuses on the very issue here. Well, it is the issue, but what's the answer? Well, the answer is that you look at the evidence that one does have of what the man has done in analogous situations, where he's been able to sell his comparative invention. But Bofors never does anything with his prior patents. It buys it, but then you have those royalties, which are paid based on their doing something, and they never do. All right. The evidence at trial showed that what happened there was that the government decided to build a system it called Excalibur, on which it spent conservatively over half a billion dollars, in which the trial courts, the evidence in the trial courts, so it's only made 30 rounds after 10 years of development. And so since Bofors, as a government contractor, joined the team that built that system, it did not further exploit Mr. Lennox's invention. Now, understanding that Bofors did not do that, he went to other potential customers and tried to sell his invention. And I think that's the important point. But wait, let me ask you before you run out of time here. You didn't even try to put in evidence of development costs and marketing costs. I mean, even under the court of claims case law, you could have recovered that. Why didn't you seek that as damages? I think, and we could point to this in the record, there is some evidence of the development costs that Mr. Lennox had. But there's no finding there. So you didn't ask for that as a measure of damage. And you haven't asked for it here. No, what we've asked for here is a remand on the basis of an appropriate standard, so that we could go back to the trial court and try to demonstrate the actual harm done under the appropriate standard of evaluation. All right, let's hear from the government. Mr. Hoskin. Thank you, Your Honor. May it please the court. This case really turns on the factual evidence and not the legal standard that's being employed here. But that's the problem, isn't it? Here we have an inventor who is precluded from selling his invention. Therefore, we don't have the value to the customer, which is how one measures the value. And therefore, we say, well, that's too bad. Whereas we have a statute clearly designed to encourage invention, not to discourage, by providing a statutory basis for compensation when you're under secrecy orders. So how does one resolve this dilemma? Your Honor, we believe that the proper way to resolve it is essentially the way that the court did in Constant I and that this court did. If you look to what the plaintiff or the claimant has presented, the only standard that's actually set forth in Section 183 is that it has to be damage caused by the order. As Judge O'Malley pointed out, that assumes that we're using damage in its ordinary meaning, and it has to be some kind of concrete harm. So what sort of proof in the government's view was absent here that could have been provided without violating the secrecy order? I think there's a couple things that certainly could have been done that would have assisted, perhaps, and that would certainly have assisted the court. For instance, there's no connection, no causal connection, established by plaintiff, or by Mr. Lennox, between the alleged harm that was caused and the secrecy orders themselves. Well, how can he do that if he can't disclose what's secret? Well, he could. In fact, he could to the court, because before we went to trial, the parties agreed and the patent office issued a limited exception that still exists today for this court as well. He can't disclose it to the court. He can't disclose it to the customer. He can't disclose it to the marketplace. He can't disclose it to anybody except the judge. That's true. Could he have disclosed it to an expert, an evaluation expert? That certainly is a possibility. Yes or no? Is it a possibility, or is he going to end up in jail? I do not recall the exact wording of the patent office's order in this case, but we certainly would have worked with him on it, even if it had not specifically allowed it. We worked with Mr. Scott before trial to ensure that he had the ability to try to bring the facts he wanted to the court. In your red brief, you say that he failed to provide documents related to sales to Dassault and Rexham. Right. Did you obtain those in discovery? Were you seeking them? No. We heard about it at trial, and when I asked him at trial why he didn't produce records, he said because nobody asked him to. There's a debate about the 1997 through 2002 marketing period, and you said you didn't give any evidence of him showing that at that point he didn't have a secrecy order in place. He could have been marketing it. But if he had been marketing the new technology before the application date, then he would have faced an on-sale bar, would he not? That's true, but he controlled when he filed the application. So if all he had to do – we know that by 1997 he had the idea. He wrote – it's A2557 in the appendix is the document that he sent to Mr. Scott that lays out the basis of his invention. And that was on August 25th of 1997. From that point forward, at least, we know that he controlled when he actually filed the application. That was within his power. It wasn't within the government. But then presumably the secrecy order would have been put in place before 2002. It could have, yes. There was actually a lag after the – there's generally a lag between the time the application is filed and the secrecy order comes into place, but that was like a year or less in this case. Well, it was just a couple of months. Well, I think there was a – Both events occurred in 2002, the filing and the order, so it has to be less than a year. He requested a license for filing, which was denied. Correct, but there was a provisional application in February of 2001. Let me ask you what I asked Mr. Scott, consistent with the fact that we're sitting in open court. What could he reveal under the secrecy order to potential customers? Well, I think that, again, to some degree is a matter that because he made no effort, we don't know. He had the ability to seek a modification of the order. He didn't attempt to modify it at any time. Part of – but he still would have been up against the ITAR as well. What's the success rate on modifications? You say you know of at least one that got modified. Have there been others that have been modified? Well, the witness at trial testified to one that he had done. I believe that there have been others. I do not have actual data on that. The testimony at trial was that in the case of Picatinny Arsenal for that particular – with patent applicants, sometimes if it's just a matter of language – I think that you're being unrealistic. This is a matter of munitions, an improvement of a process or a product that at that stage looked as if it had potential value. And you're saying, well, you could have done this or that. What's of concern here, the next time with this decision, the next time an inventor who has an idea of value to our government and to others as a matter of munitions, he won't file a patent application in the United States. He'll take it to Switzerland and file there, and we're out of it. Where is the government interest in some kind of rigid, rigorous proof of injury when it's difficult? Now, it may be, just to round out the thought, that the difficulties of proof here are insurmountable. It may be that saying that there was a certain value to a predecessor product is insufficient because of all of the facts that the record says as to what wasn't there. But to say that you should or could have done a whole bunch of things that on their face would not have succeeded can't be enough for the government position in a situation such as this. Well, I would disagree, Your Honor. I would like to point out first that Mr. Linick himself had, as to at least two of the inventions covered by the three patent applications, similar patents that were issued. So the problem is not necessarily with the technology being released. There's something else there. How do we know if you have an improvement in munitions transmission? It may very well be that the improvement, which is under the secrecy order, is what's of significance, not that there's something else that the customer isn't interested in. Well, in this case, we don't know because we were never asked to go back and re-evaluate the secrecy order. So it's given the way it was issued. Those orders are routine. It's standard. Munitions go under secrecy order. Not necessarily, Your Honor. As I pointed out, the four applications that he had were all for munitions. They were for impulse engines. They were for the vertical reference system. And there are other munitions out there that are not under secrecy. And as to the later applications, he was allowed to do the foreign licensing. Is that right? Yes, Your Honor, although I will note that the applications are all the same. What is disclosed in the applications and the specifications is identical. So barring one really doesn't make that much difference. We point it out simply because it's some indication that he probably could have received a foreign filing license had he requested it. But that was never requested either. Are you aware of any applicant who has received funds under 183? Yes, we are. Do you know how many? There are. Now, limiting it to the situation where it's not used by the government. Right, so where the government doesn't practice it. Right. In the last ten years, I know of one case where that has occurred. I only know of three cases that have been brought to the Court of Federal Claims in the last 20 years. And those three all denied relief, correct? Two of them denied relief. One was actually the District of Massachusetts, but under the same provision of 183. So there's been one where there was actually a settlement, and there have been two that I know of where I do not believe there is compensation. Well, and that includes this case. So that's one other besides this case. What are the guidelines the statute provides for compensation? The reason is to encourage inventors, recognizing the realities of secrecy orders. So the statute establishes a system that, on its face here, failed only because of a difficulty of evaluation. How does one overcome that, Mr. Scott? Is it the same way you evaluate anything else? Well, and I would agree that in terms of the quantum of damages, the statute talks in terms of just compensation. So as to the quantum, but not the entitlement, you would look to Fifth Amendment law for determining how it's done. And frankly, we have always proposed that all he's required to do is to determine it by a reasonable certainty, which is the normal kind of standard for damages calculations. But there has to be some kind of concrete harm, and that concrete harm has to be caused by the secrecy order. If the invention is under secrecy order, there's an implication that it is not a harmless device. That is, that it has some utility in harming people, or it wouldn't be secret. Isn't that true? Well, but the reason that it's under secrecy can be one of two things. Either because there is some harm to national security, regardless of whether the invention is even practical. Or it could be impractical and still be harmful. It could disclose, the application could disclose something that the government believes would be harmful if released to the public. Or it can be that the technology itself is valueless and yet harmful. Correct. That's not a position that the government took here, as I understand it. The government's position is that you didn't prove damages, speculated. Well, we... Actually, there was testimony, and the court did note in a footnote that Mr. Moran's testimony, that either of these two occurrences could cause the secrecy order. And that he wasn't, but the court didn't have to reach that, because the question before the court is not, is the secrecy order proper or why? The court has no say in that at all. The only question before the court is, was the damage caused by the order, and if so, how much damage? Okay, so you're saying that the trial court's conclusions really turn on causation. That the trial court said there was no causal connection between any harm to him and the secrecy order. Therefore, I don't need to get into the quantum of damages. That's correct. Although I think the court also had difficulty with the second issue, with how much, because he's only got this one data point of 2.5 million, which seems to be brought out of thin air, because it's based on something of 3.5 million, that never went anywhere. But I think that's why the court really focused primarily on the causation issue, and say, Mr. Lennox's marketing plan and business plan was essentially impractical, and it was doomed to failure to start with. Now, he doesn't come out in that many words and say it, but that's essentially the quantum of the evidence that you see, is that no matter what Mr. Lennox would have done, there was nobody that was going to be buying his inventions. And this one, I understand I'm out of time, but I would like to point out that while Mr. Scott says it's an integrated system, if you look at those patent applications, it's nothing more than the three components, or it's one more component than the two components that had been previously issued in patents. What does that have to do with Mr. Lennox's invention? The problem with it is he could, in his testimony, Mr. Lennox's testimony at trial, was that he was trying to produce this musical instrument that would play beautiful music, essentially, in his words, but he couldn't do it because he could only show certain parts. Well, that's the only thing he had was a couple of parts. It would have taken anybody a lot more parts. You're saying that his invention was not worth paying for? I mean, are you telling us the evaluation when the evaluation was not done because the subject matter hadn't been tested in the marketplace? No, Your Honor, I'm not saying that. I think that the point here is that the evidence doesn't show that he had something that he could go out to the marketplace and sell. He had a couple components for a round. He says he was under secrecy order, and he was making sure that he complied with that secrecy order. You're telling us he could have maybe stretched the order, taking a chance, disclosed more than he thought might have been disclosable under a rigid interpretation and gotten a better market evaluation of what these improvements were worth? No, Your Honor, I'm not saying that at all. I am saying that his experience with the Japanese and the Koreans did demonstrate that there were a lot of other factors that went into why his marketing plan was failing. Okay. Any other questions for Sahovsky? Thank you. Thank you for the additional time. And Mr. Strout, you have two minutes for rebuttal. Let me just make a very limited number of points. The evidence at trial from Mr. Linick, and remember he couldn't disclose it to others, so he couldn't get an evaluation by an independent source, was that what he had done is taken the various... He asked for a modification of the order to allow him to have an expert. Okay. So the... what now? What the... I think that's a yes or no. There is an ability to modify, but it's not practical in the case that Mr. Linick was... where he was trying to sell his invention. If you look at the regulations which are in the record, it says that in order to seek a modification, you must identify the persons to whom it's to be modified, or to whom it's to be disclosed. But my question was, did you seek to modify it so that you could disclose the information to an identified expert who could operate under a protective order? No, we did not do that. Okay. Why didn't you provide the documents from Desso and Rex in the trial? Well, Mr. Linick no longer has them. I mean, in other words, we did do a search for... I mean, in fact, at the request of the government, we did a search for anything that Mr. Linick had that went to the value of any of his work, and we searched his... and he's an individual. He's moved from Switzerland to Florida and other places, and there were no documents available. I mean, anything that we had, we produced. I think the important point here, just to sum up, is that the modification of the order isn't self-defeating because if you simply read what you have to do, you have to show the governmental purpose involved in it, and it doesn't necessarily extend to activities outside the United States. Any more questions? No questions? Thank you very much. Thank you, Mr. Scott. Thank you, Mr. Haskin. The case is taken under submission.